# In the United States Court of Federal Claims

No. 09-392 C
(Filed Under Seal: February 26, 2010)
(Reissued for Publication: March 29, 2010)[1]

| | |
|---|---|
| ****************************** | RCFC 12(b)(1); Statute of Limitations, 28 U.S.C. |
| PAUL M. DEAN, JR.,          * | § 2501; Wrongful Discharge Claim; Military |
| * | Pay Act, 37 U.S.C. § 204; Disability Retirement |
| Plaintiff,   * | Claim; 10 U.S.C. § 1201; Administrative Procedure |
| * | Act, 5 U.S.C. §§ 701-706; Equitable Tolling; |
| v.                                    * | Tolling of Statute of Limitations Due to Legal |
| * | Disability or Mental Impairment; Chambers; |
| THE UNITED STATES,            * | Friedman; Goewey; Martinez; Real; Ware; |
| * | Servicemembers Civil Relief Act, 50 U.S.C. app. |
| Defendant.   * | § 526; Diamond; "Active Duty"; DD Form 214; |
| ****************************** | 10 U.S.C. § 1211; Binding Precedent |

Michael D.J. Eisenberg, Washington, DC, for plaintiff.

John S. Groat, United States Department of Justice, Washington, DC, for defendant.  Capt. Lauren DiDomenico, of counsel.

## OPINION AND ORDER

**SWEENEY**, Judge

Before the court is the government's motion to dismiss ("motion").  In this action, plaintiff alleges that he was wrongfully discharged from the United States Air Force ("Air Force") without being assigned the correct percentage rating for service-connected disabilities. The government moves to dismiss the complaint pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") on the basis that the governing statute of limitations, 28 U.S.C. § 2501, precludes the court from entertaining the complaint.  The court deems oral argument unnecessary and, for the reasons discussed below, grants the government's motion.[2]

---

[1]  The court filed this opinion under seal due to its detailed description of plaintiff's medical history.  If either party believed that this opinion contained protected material that should be redacted prior to the opinion being made available to the public, then that party was to file, by no later than March 19, 2010, a motion requesting redaction.  Neither party filed such a motion.

[2]  Plaintiff purports to name Michael B. Donley as a defendant in his official capacity as Secretary of the Air Force.  Compl. ¶ 6.  The only proper defendant for any matter before the

## I.  BACKGROUND[3]

Plaintiff Paul M. Dean, Jr. served in the Air Force from August 11, 1987, to November 13, 2000, at which time he was honorably discharged from active duty in the grade of staff sergeant by reason of temporary disability.  Compl. ¶¶ 5, 8; Pl.'s Ex. 1 (containing a September 15, 2006 Rating Decision by the United States Department of Veterans Affairs ("VA") acknowledging that plaintiff served in the Air Force from August 11, 1987, to November 13, 2000), 4 (containing the VA's March 21, 2005 Rating Decision indicating the same dates of service); Def.'s Supplemental App. 1 (containing a DD Form 214, "Certificate of Release or Discharge from Active Duty," which states that plaintiff was separated from the Air Force on November 13, 2000[4]), 2 (indicating that plaintiff was "relieved from active duty" effective November 13, 2000, and that plaintiff was "placed on the temporary disability retired list" effective November 14, 2000).  But see Def.'s Mot. App. 1 (stating that plaintiff was discharged on August 25, 2002); Def.'s Supplemental App. 3 (noting that plaintiff was discharged in the grade of staff sergeant by reason of physical disability effective August 25, 2002).  Prior to his separation from the Air Force, plaintiff received numerous commendations.  See Def.'s Supplemental App. 1.

At some point during his service, plaintiff began experiencing health issues that were brought to the attention of the Air Force.  See Def.'s Reply App. 4 (stating, in a January 29, 2003 letter to the Air Force Board for Correction of Military Records ("AFBCMR"), that plaintiff's "declining health issue begun [sic] while on active duty serving [his] country").  An Informal

---

United States Court of Federal Claims ("Court of Federal Claims") is the United States, not its officers or any other official.  Stephenson v. United States, 58 Fed. Cl. 186, 190 (2003); see also RCFC 10(a) ("The title of the complaint must name all the parties . . . , with the United States designated as the party defendant[.]").

[3]  The facts are derived from the following sources: the complaint; appendices accompanying the government's motion ("Def.'s Mot. App."), reply in support thereof ("Def.'s Reply App."), and supplemental brief ("Def.'s Supplemental App."); and an exhibit accompanying plaintiff's response to the government's motion ("Pl.'s Ex.").

[4]  Pursuant to 10 U.S.C. § 1168, "[a] member of an armed force may not be discharged or released from active duty until his discharge certificate or certificate of release from active duty, respectively, and his final pay or a substantial part of that pay, are ready for delivery to him . . . ." 10 U.S.C. § 1168(a) (2006).  In implementing this statute, the United States Department of Defense devised Form 214, which "record[s] and report[s] the transfer or separation of military personnel from a period of active duty." 32 C.F.R. § 45.2(a) (2009).  DD Form 214 provides "[a]ppropriate governmental agencies with an authoritative source of information which they require in the administration of Federal and State laws applying to personnel who have been discharged, otherwise released, or transferred to a Reserve component while on active duty." Id. § 45.2(b)(3).

Physical Evaluation Board ("PEB") was convened and, on August 25, 2000, plaintiff was assigned a thirty percent disability rating for obstructive sleep apnea ("OSA") and a ten percent disability rating for degenerative disk disease.[5]  Compl. ¶ 13.  Thereafter, effective November 14, 2000, plaintiff was placed on the Temporary Disability Retired List ("TDRL").  Def.'s Reply App. 2-4; accord Def.'s Supplemental App. 2.  According to plaintiff, he "would have completed at least 20 years [of service] if it weren't for [his] disabilities . . . ."  Def.'s Reply App. 2 (containing a July 3, 2002 letter from plaintiff to the Air Force Personnel Board).

Plaintiff alleges that in July 2001, the VA determined that he had a service-connected disability for OSA, status post uvulopalatopharyngoplasty ("UPPP"), at a rate of fifty percent.[6]  Compl. ¶ 10.  This rating was made effective retroactively to November 14, 2000.  Id.  On December 5, 2001, plaintiff asserts that the VA rated him unemployable due to his inability to "secure or follow a substantially gainful occupation as a result of service-connected disabilities . . . ."  Id. ¶ 12.  This determination was also made effective retroactively to November 14, 2000.  Id.; see also Def.'s Reply App. 2, ¶ 6 (indicating, in a July 3, 2002 letter to the Air Force Personnel Board, that plaintiff was deemed "100 percent unemployable" and that "this action was back dated to 14 November 2000, the date [he] was placed on TDRL").

It appears from the materials before the court that plaintiff was reevaluated in February 2002 for the purpose of determining whether he would remain on the TDRL, permanently retire, or be removed or separated from the Air Force.  Def.'s Reply App. 4.  In April 2002, notwithstanding its August 25, 2000 determination that plaintiff possessed a thirty percent disability rating for OSA, the Informal PEB reduced its rating to zero percent, finding that plaintiff's condition "appeared to be stable."  Compl. ¶ 14.  A month later, plaintiff sought an evaluation at a civilian sleep clinic, which "found him to have OSA that was potentially life-threatening."  Id. ¶ 17.  It is unclear from the materials before the court whether evidence from plaintiff's visit to the civilian sleep clinic in May 2002 was presented to and considered by the Formal PEB, which, on June 22, 2002, concurred with the Informal PEB's determination and rating decrease.  Id. ¶ 15.  The Formal PEB determined that plaintiff was unfit due to physical disability and "recommended discharge with severance pay at a ten percent rating."  Id. ¶ 16.

---

[5]  A PEB "determines a service member's fitness for duty and entitlement to disability retirement once a Medical Examination Board or MEB finds the soldier does not meet the [Air Force's] standards for retention under its regulations."  Chambers v. United States, 417 F.3d 1218, 1225 n.2 (Fed. Cir. 2005).

[6]  UPPP, also referred to as palatopharyngoplasty, is a surgical procedure that is designed to widen the airway and relieve OSA or severe snoring.  Dorland's Illustrated Medical Dictionary 1385, 2042 (31st ed. 2007); see also Snoring and Obstructive Sleep Apnea 107 (David N.F. Fairbanks et al., eds., 3d ed. 2003) (indicating that the objective of UPPP is to "correct anatomical abnormalities in the oropharyngeal airway and to enlarge and stabilize it").

On July 3, 2002, plaintiff submitted a rebuttal letter contesting the findings of the Formal PEB.[7] Def.'s Reply App. 1.  In his letter, plaintiff expressed his belief that the Formal PEB "went through the daily routine of hearing a case . . . and before [he] physically arrived for said hearing . . . already determined to rubber stamp the recommendation suggested by the [Informal PEB] after [his] exams in February 2002."  Id. ¶ 1.  Additionally, plaintiff indicated that he enrolled in college classes "to keep [his] mind focused," but was struggling both physically and academically due to his disabilities.  Id. ¶ 5.  Plaintiff asserted that a service member "may be assigned a disability rating of 100 percent if the member's impairment is sufficient to render it impossible to engage a substantially gainful occupation" and argued that he was "medically entitled" to such ratings.  Id. at 2, ¶ 6.

In an August 1, 2002 memorandum recommending that plaintiff be removed from the TDRL and discharged with severance pay with a disability rating of ten percent, Colonel Joseph M. Marchino II, Deputy Director of the Secretary of the Air Force Personnel Council, noted that the Air Force Personnel Board ("AFPB") considered plaintiff's rebuttal letter and his contention that he was entitled to a 100 percent disability rating due to unemployability.[8]  Def.'s Mot. App. 3.  Colonel Marchino indicated that the AFPB reviewed evidence and testimony presented before the Formal PEB, remarks by the Formal PEB, remarks by the Informal PEB, the TDRL evaluation, plaintiff's service medical record, and the medical summary that led the Medical Evaluation Board ("MEB") to concur with the recommendations of the Formal and Informal PEBs.  Id.  The AFPB, Colonel Marchino stated, opined that "the zero . . . percent rating (next level of improvement listed in the [VA's] Schedule for Rating Disabilities for his condition) rendered by previous boards appropriately characterizes [plaintiff's] present condition."  Id.  Moreover, the AFPB disagreed with plaintiff's assertion that his condition rendered him unemployable.  Id.  The AFPB, while "sympathetic with the member's continuing symptoms and need for continued care," noted that the VA possessed numerous resources that would be of assistance to plaintiff.  Id. at 4.

On August 5, 2002, Brenda L. Kurth, Chief of the Disability Operations Branch for the Air Force Physical Disability Division, notified plaintiff that officials within the Office of the Secretary of the Air Force directed his removal from the TDRL and discharge with entitlement to disability severance pay.  Id. at 2.  Plaintiff's discharge, the letter indicated, would become effective on August 25, 2002.  Id.  Plaintiff was ultimately removed from the TDRL and was discharged from the Air Force in the grade of staff sergeant by reason of physical disability, with entitlement to disability severance pay, on August 25, 2002.  Id. at 1-2; accord Def.'s Reply App. 3, 8; see also Def.'s Supplemental App. 3 ("Effective 25 Aug 2002 you are removed from the

---

[7] A significant portion of the letter has been redacted.  See Def.'s Reply App. 1-2.

[8] A significant portion of this memorandum has been redacted.  See Def.'s Mot. App. 3-4.  Colonel Marchino noted that plaintiff sought, in the alternative, receipt of a combined disability rating of sixty, fifty, and ten percent for his various ailments.  Id. at 3.

temporary disability retired list and discharged in the grade of Ssgt by reason of physical disability . . . with entitlement to disability severance pay.").

Shortly thereafter, on January 29, 2003, plaintiff submitted an "Application for Correction of Military Record," wherein he sought the restoration of his thirty percent disability rating and retirement status. Def.'s Reply App. 3. Plaintiff indicated in his application to the AFBCMR that the "date of discovery" of these alleged errors was "June 2002." Id. In an accompanying letter to the AFBCMR, plaintiff indicated that he "believe[d] that [he was] a victim of injustice concerning [his] military record," stating that his removal from the TDRL was "in error." Id. at 4. According to plaintiff, neither his OSA nor his degenerative disk disease improved; to the contrary, he claimed that both had "progressively worsened!"[9] Id. The AFBCMR denied plaintiff's request to restore his disability rating of thirty percent for OSA on September 25, 2003.[10] Compl. ¶ 18. Plaintiff claims that this decision was both arbitrary and capricious. Id. ¶¶ 1, 18.

Plaintiff alleges that, on January 22, 2004, an AFBCMR panel member stated that a December 5, 2001 VA rating decision "'gives credence to the applicant's claim that his OSA renders him unemployable.'" Id. ¶ 19. At some point between September 25, 2003, and February 13, 2004, plaintiff apparently submitted a new application to the AFBCMR. In a March 19, 2004 letter to the AFBCMR, plaintiff acknowledged receipt of a February 13, 2004 denial of his application. Def.'s Reply App. 9. In this March 19, 2004 letter, plaintiff expressed his belief that "there is an injustice being made in [his] case," stated that "[t]here was enough information to get [him] placed on the retired list," and referenced three documents he was submitting in support of his request for reinstatement of his retired status. Id.

The VA, in a March 21, 2005 rating decision, made several evaluations related to plaintiff's conditions. See Pl.'s Ex. 5. These included: (1) an increase from forty to sixty percent disability, effective September 13, 2004, for degenerative disk disease, cervical spine, with left cervical radiculopathy of the left shoulder, left elbow, and left wrist; (2) an increase from ten to twenty percent disability, effective September 13, 2004, for hypertension with erectile dysfunction; (3) an increase from zero to ten percent disability, effective September 13, 2004, for bilateral pes planus; (4) eligibility for Dependents' Education Assistance, established from January 31, 2005, the date of plaintiff's VA examination, based upon evidence showing that plaintiff had a total service-connected disability that was permanent in nature; (5) continued evaluation of fifty percent disability for OSA, status post UPPP; (6) continued evaluation of twenty percent disability for recurrent low back pain with history of degenerative disc disease,

---

[9]  A significant portion of this letter has been redacted. See Def.'s Reply App. 4-5. However, it is clear that the redacted portions describing the ten and thirty percent disability ratings to which plaintiff refers are for OSA and degenerative disk disease, respectively.

[10]  The September 25, 2003 decision of the AFBCMR was not part of the materials submitted by the parties.

lumbar spine; (7) continued evaluation of ten percent disability for pseudofolliculitis barbae; (8) continued evaluation of zero percent disability for sinusitis/pansinusitis; (9) continued evaluation of zero percent disability for bronchitis/asthma; (10) confirmed and continued special monthly compensation for loss of the use of a creative organ; (11) denials of determinations of service connection for (a) bilateral knee pain, (b) diabetes mellitus, and (c) removal of the gall bladder; (12) confirmation and continuance of a previous denial of a service connection for high cholesterol; and (13) denials of claims due to lack of new and material evidence of a service connection for (a) arthritis, bilateral feet, (b) sprained left wrist (non-dominant), and (c) gastritis/gastroesophageal reflux disease.  Id. at 5-14.

Plaintiff alleges that, as of September 15, 2006, the VA was awarding him "service connected disability at a combined rating of 100%."  Compl. ¶ 9.  The VA, in a September 15, 2006 rating decision, made three additional evaluations related to plaintiff's conditions.  See Pl.'s Ex. 1-3.  These included: (1) granting a service connection for major depression, secondary to the service-connected disability of OSA, status post UPPP, with an evaluation of fifty percent disability effective December 12, 2005; (2) granting a service connection for mandibular alveolar ridge hypoesthesia[11] with an evaluation of zero percent disability effective November 21, 2005; and (3) increasing, from zero to ten percent disability, sinusitis/pansinusitis effective April 24, 2006.  Id.

On January 4, 2008, plaintiff submitted to the AFBCMR another "Application for Correction of Military Record."  Def.'s Reply App. 8.  In his application, plaintiff sought the following relief: (1) removal of his August 25, 2002 discharge date; (2) return to the active list; (3) medical retirement at 100 percent disability as of August 25, 2002; and (4) all benefits of a retiree.  Id.  In an accompanying letter to the AFBCMR, plaintiff requested, among other things, that the AFBCMR "rate [him] 100% disabled . . . based on the combination of all [his] service connected disabilities."[12]  Id. at 10.  Also, on September 3, 2008, plaintiff wrote a letter to Congressman Gene Green.[13]  See id. at 6-7.  In his letter to Congressman Green, plaintiff noted that (1) he was making a "second attempt pleading with the U.S. Air Force," (2) he "was informed during [his] outprocessing [sic] that [he] would be given a future appointment, to return and be reevaluated for these disabling conditions, and if stabilized or improved that [he] would have the option of returning to active duty to complete my service time or separation," and (3) if his conditions did not approve, then plaintiff "would be placed on the Permanent Duty Retired List [("PDRL")]."  Id. at 6.  Plaintiff requested that Congressman Green assist him with, among other things, obtaining relief from the AFBCMR so that it would "approve[] [his] 100% PDRL

---

[11]  Mandibular alveolar ridge hypoesthesia refers to the abnormal decrease in sensitivity of the lower jaw bone cavity where roots of the teeth are attached.  See Dorland's Illustrated Medical Dictionary, supra note 6, at 56-57, 914, 1116.

[12]  Portions of this letter have been redacted.  See Def.'s Reply App. 10-11.

[13]  Portions of this letter have been redacted.  See Def.'s Reply App. 6-7.

with all associated benefits of a disabled military retiree . . . ." Id. at 7.  On November 19, 2008, the AFBCMR denied plaintiff's application.  Compl. ¶ 20.  Plaintiff alleges that this denial was both arbitrary and capricious.  Id.

## II.  PROCEDURAL HISTORY

Plaintiff filed his complaint in the Court of Federal Claims on June 16, 2009.  The complaint alleges two claims for relief, both of which are asserted under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 (2006).  First, plaintiff alleges that the AFBCMR's September 25, 2003 and November 19, 2008 decisions "contained manifest errors and were clearly erroneous" and were "contrary to the [VA's] award for service connected disability benefits."  Compl. ¶ 22.  Second, plaintiff alleges that the AFBCMR's two decisions "contained factual and legal errors" and ignored new and material evidence that plaintiff presented.  Id. ¶ 24.  Plaintiff requests that the court grant him a "service-connected disability rating of 30 percent for his OSA" and a "service-connected disability rating of 100 percent due to his service-connected disabilities that render him unable to obtain substantive gainful employment."  Id. ¶¶ 27-28.  Alternatively, plaintiff requests that the court remand this matter to the AFBCMR "with specific guidelines in conjunction with Plaintiff's arguments."  Id. ¶ 28.

On January 22, 2010, after briefing on the government's motion concluded, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") issued a nonprecedential decision in Cronin v. United States, a case involving, among other things, tolling of the applicable statute of limitations after a service member of the United States Navy was evaluated by a PEB and was eventually placed on the TDRL.  See No. 2009-5046, 2010 WL 270891, at *1-2 (Fed. Cir. Jan. 22, 2010).  The Federal Circuit, which raised sua sponte whether the statutory tolling provision of the Servicemembers Civil Relief Act ("SCRA"), 50 U.S.C. app. § 526(a) (2006), applied to the plaintiff, deemed this issue a "question of considerable importance," id. at *4, vacated a decision dismissing certain claims as time-barred, and remanded for a determination of the applicability of section 526(a), id. at *4-5.  In light of Cronin, the court requested supplemental briefing concerning the applicability of section 526(a) in this case.  With this issue fully briefed, the court turns to the government's motion.

## III.  LEGAL STANDARDS

### A.  Subject Matter Jurisdiction

Whether the court possesses jurisdiction to decide the merits of a case is a threshold matter.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998).  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).  The parties or the court sua sponte may challenge the court's subject matter jurisdiction at any time. Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006); see also RCFC 12(h)(3) ("If the court

determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

The ability of the Court of Federal Claims to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941). A waiver of immunity "cannot be implied but must be unequivocally expressed." United States v. King, 395 U.S. 1, 4 (1969). The Tucker Act, which confers upon the Court of Federal Claims jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort," 28 U.S.C. § 1491(a)(1) (2006), is merely a jurisdictional statute. It "does not create any substantive right enforceable against the United States for money damages." United States v. Testan, 424 U.S. 392, 398 (1976); see also Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc portion) (stating that the Tucker Act "itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages" (citing United States v. Mitchell, 463 U.S. 206, 216 (1983))). The separate source of substantive law must constitute a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." Lovelades Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).

To find that a constitutional provision, statute, or regulation is money-mandating, "the allegation must be that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." Eastport S.S. Corp. v. United States, 372 F.2d 1002, 1007 (Ct. Cl. 1967); see also id. at 1009 ("Under Section 1491, what one must always ask is whether the constitutional clause or legislation which the claimant cites can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained."). The Federal Circuit has instructed that a court, when engaging in a jurisdictional analysis, must determine whether the plaintiff has alleged a right to recovery premised upon a money-mandating constitutional provision, statute, or regulation. Fisher, 402 F.3d at 1173 (en banc portion). "If the court's conclusion is that the Constitutional provision, statute, or regulation meets the money-mandating test, the court shall declare that it has jurisdiction over the cause, and shall then proceed with the case in the normal course." Id. "Only after this initial inquiry is completed and the Court of Federal Claims takes jurisdiction over the case does it consider the facts specific to the plaintiff's case to determine 'whether on the facts [the plaintiff's] claim f[alls] within the terms of the statutes.'" Greenlee County, Ariz. v. United States, 487 F.3d 871, 876 (Fed. Cir. 2007) (quoting Fisher, 402 F.3d at 1172) (alterations in original); see also Yant v. United States, 85 Fed. Cl. 264, 269 (2009) ("Subject matter jurisdiction is determined independently of analyzing whether a plaintiff might ultimately succeed on the merits."). The Federal Circuit explained that, when determining whether the Court of Federal Claims possesses jurisdiction,

all that is required is a determination that the claim is founded upon a money-

8

mandating source and the plaintiff has made a nonfrivolous allegation that it is within the class of plaintiffs entitled to recover under the money-mandating source. There is no further jurisdictional requirement that the court determine whether the additional allegations of the complaint state a nonfrivolous claim on the merits.[14]

Jan's Helicopter Service, Inc., 525 F.3d at 1309 (footnote added).

Disability retirement claims, which are governed by 10 U.S.C. § 1201, are money mandating. Chambers, 417 F.3d at 1223 (stating that section 1201 is "a money-mandating statute"). Section 1201 provides that, upon a determination by the Secretary of the Air Force that a service member is "unfit to perform the duties of the member's office, grade, rank, or rating because of physical disability incurred while entitled to basic pay," the service member may retire for disability. 10 U.S.C. § 1201(a) (2006). Additionally, claims for wrongful discharge under the Military Pay Act, 37 U.S.C. § 204 (2006), are money mandating.[15] Martinez v. United States, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (en banc). The complaint does not cite either 10 U.S.C. § 1201 or 37 U.S.C. § 204. Nevertheless, the court will assume that the complaint was properly pled. See Schmidt v. United States, 89 Fed. Cl. 111, 119 n.9 (2009).

---

[14] This holding stands in contrast to a prior Federal Circuit holding in Moden v. United States, 404 F.3d 1335 (Fed. Cir. 2005). The Moden court concluded that it had jurisdiction to reach the merits of the plaintiffs' case because their claim was "neither frivolous, nor so insubstantial, implausible, foreclosed by prior decisions, or otherwise completely devoid of merit as not to involve a federal controversy." Id. at 1341-42. In Jan's Helicopter Service, Inc. v. FAA, the court held that the jurisdictional requirement of a nonfrivolous claim did not apply to complaints filed in the Court of Federal Claims. See 525 F.3d 1299, 1300 (Fed. Cir. 2008). When "there is a direct, irreconcilable conflict between two panel decisions of the Federal Circuit, the earlier decision is controlling precedent." Briseno v. United States, 83 Fed. Cl. 630, 633 n.5 (2008) (citing Newell Cos. v. Kenney Mfg. Co., 864 F.2d 757, 765 (Fed. Cir. 1988) ("This court has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned in banc. When there is direct conflict, the precedential decision is the first." (citation omitted))). However, "the Jan's Helicpoter [Service, Inc.] panel announced that any contrary aspects of the Moden discussion of the 'nonfrivolous' claim issue were dicta . . . ." Id.; see Jan's Helicopter Service, Inc., 525 F.3d at 1308 n.9 ("In any event, the court's statements [in Moden], quoted at page 4 of the dissent, are dicta, and we are not bound by them . . . ."). Consequently, this court is "constrained to follow Jan's Helicopter [Service, Inc.] as controlling precedent even though it is the later-issued circuit decision." Briseno, 83 Fed. Cl. at 633 n.5.

[15] In his opposition to the government's motion, plaintiff argues that he was "wrongfully discharged by the Government and denied pay and retirement benefits." Pl.'s Opp'n 2; see also Compl. ¶ 1 (alleging that plaintiff was "wrongfully discharged . . . without being given the correct percentage rating for service-connected disabilities").

### B. Statute of Limitations

Statutes of limitations "are vital to the welfare of society and are favored in the law." Wood v. Carpenter, 101 U.S. 135, 139 (1879). The government has moved to dismiss the complaint for lack of jurisdiction, contending that plaintiff's claims are time-barred by the statute of limitations applicable to actions filed in the Court of Federal Claims. "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. A claim under the Tucker Act accrues "as soon as all events have occurred that are necessary to enable the plaintiff to bring suit, i.e., when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money.'" Martinez, 333 F.3d at 1303 (quoting Nager Elec. Co. v. United States, 368 F.2d 847, 851 (Ct. Cl. 1966)).

The statute of limitations barring actions against the United States "is jurisdictional, because filing within the six-year period is a condition of the waiver of sovereign immunity in the Court of Federal Claims under the Tucker Act." Sabree v. United States, No. 09-369C, 2009 WL 4729666, at *5 (Fed. Cl. Nov. 13, 2009); accord John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1354 (Fed. Cir. 2006), aff'd, 552 U.S. 130 (2008). As such, section 2501 must be "strictly construed." Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988). Furthermore, the United States Supreme Court ("Supreme Court") has determined that section 2501 is "not susceptible to equitable tolling." John R. Sand & Gravel Co., 552 U.S. at 136.

### IV. DISCUSSION

### A. The Statute of Limitations Bars Plaintiff's Claim for Wrongful Discharge

Plaintiff alleges that he was "wrongfully discharged" from the Air Force "without being given the correct percentage rating for service-connected disabilities." Compl. ¶ 1. To the extent that plaintiff asserts a claim for wrongful discharge pursuant to 37 U.S.C. § 204, such claim is foreclosed by 28 U.S.C. § 2501. The Federal Circuit addressed the accrual of a wrongful discharge claim in Martinez, affirming the dismissal of a claim that was filed more than six years after the service member's separation from active duty. A service member "has the right to sue immediately upon discharge for the funds improperly being withheld," the Martinez court noted, 333 F.3d at 1303, and that such a claim accrues "'at one time, once and for all,'" id. at 1304 (quoting Mathis v. United States, 391 F.2d 938, 939 (Ct. Cl. 1968)). Thus, the Federal Circuit concluded, a claim for back pay is not a "'continuing claim.'" Id. at 1303. Furthermore, the Federal Circuit rejected the plaintiff's contention that his claim did not accrue until after he sought relief from a correction board and received a final decision from that body denying relief, stating:

> [S]ince their creation, the correction boards have been regarded as a permissive administrative remedy and that an application to a correction board is therefore

10

not a mandatory prerequisite to filing a Tucker Act suit challenging the discharge. Accordingly, the failure to seek relief from a correction board not only does not prevent the plaintiff from suing immediately, but also does not prevent the cause of action from accruing.

> . . . .

> . . . . [T]his court and the Court of Claims have long held that, in Tucker Act suits, a plaintiff is not required to exhaust a permissive administrative remedy before bringing suit.  As a corollary of that rule, the court has held that a plaintiff's invocation of a permissive administrative remedy does not prevent the accrual of the plaintiff's cause of action, nor does it toll the statute of limitations pending the exhaustion of that administrative remedy.

Id. at 1304 (citation omitted).  The Federal Circuit held that a cause of action for the recovery of monetary losses incurred as a result of a service member's discharge from active duty accrued on the date of the discharge, at which time the limitations period under 28 U.S.C. § 2501 began to run.  Id. at 1310; see also Schmidt, 89 Fed. Cl. at 121 (stating that claims for wrongful discharge "accrue on the date of discharge").  Here, plaintiff was released from active duty on November 13, 2000, and was discharged on August 25, 2002.  He did not file the instant complaint until June 16, 2009, a date well beyond six years of either of these dates.

Additionally, the court notes that the complaint incorrectly alleges jurisdiction under section 706 of the APA.[16]  Compl. ¶¶ 3, 22, 24.  In his opposition to the government's motion, plaintiff asserts that the statute of limitations for APA appeals regarding AFBCMR issues may be tolled, claiming that "[t]his circuit follows the criteria that the statute of limitations begins once the military board for correction of military records acts upon a claimant's request for reconsideration."[17]  Pl.'s Opp'n 6.  Plaintiff did not cite any precedent from the Federal Circuit,

---

[16]  The APA, which waives sovereign immunity only for claims "seeking relief other than money damages," 5 U.S.C. § 703, is not a money-mandating statute, Wopsock v. Natchees, 454 F.3d 1327, 1333 (Fed. Cir. 2006) ("[T]he APA does not authorize an award of money damages at all; to the contrary, . . . the APA specifically limits the Act to actions 'seeking relief other than money damages'" (citation omitted)); Martinez, 333 F.3d at 1313 (explaining that the Court of Federal Claims lacks APA jurisdiction to consider nonmonetary suits to correct military records).

[17]  In support of this proposition, plaintiff cites a case from the United States Court of Appeals for the Third Circuit, Green v. White, 319 F.3d 560 (3d Cir. 2003), which, in turn, cites a case from the United States District Court for the District of Columbia, Nihiser v. White, 211 F. Supp. 2d 125 (D.D.C. 2002).  Neither case is binding on this court.  See AINS, Inc. v. United States, 365 F.3d 1333, 1336 n.1 (Fed. Cir. 2004) (stating that holdings of the Court of Federal Claims, "like those of federal district courts, are instructive but not precedential, and do not bind future court holdings"); Bankers Trust N.Y. Corp. v. United States, 225 F.3d 1368, 1371 (Fed.

which constitutes the "relevant binding authority for this trial court." Sabree, 2009 WL 4729666, at *7 n.7. More significantly, the United States Court of Claims ("Court of Claims"), the predecessor court to the Federal Circuit, rejected plaintiff's argument outright:

> [I]t does not follow from the general existence of judicial review for Correction Board decisions that those decisions create a new substantive cause of action which has its own, new, limitations period. That a tribunal's rulings are subject to judicial review means that the administrative decision is open to scrutiny by a court, if a timely judicial proceeding is filed–not that the administrative tribunal's decision, in itself, becomes the new measure and the new beginning of the plaintiff's judicial rights. . . .
>
>     . . . .
>
> In short, . . . the existence of judicial review does not, in itself, supply any basis for asserting that the limitations period runs from the time of the Correction Board's decision. All that the existence of judicial review means is that the Board's decision will be reviewed, in a proper case, if a timely suit is brought.[18]

Friedman v. United States, 310 F.2d 381, 397 (Ct. Cl. 1962) (footnote added). The Federal Circuit reaffirmed this principle in Martinez, stating that "the existence of judicial review does not, in itself, supply any basis for asserting that the limitations period runs from the time of the Correction Board's decision." 333 F.3d at 1312. As this court explained in Sabree, "[a] cause of action does not 're-accrue' at any time when a plaintiff seeks review from a Correction Board." 2009 WL 4729666, at *7. Therefore, the fact that "[p]laintiff has filed this action within six years from the date of the military's denial of Plaintiff's first application for a records correction and his request for reconsideration," Pl.'s Opp'n 6, is irrelevant.

Based upon the precedent set forth in Martinez, any claim plaintiff asserts for wrongful discharge accrued no later than August 25, 2002, the date on which plaintiff was discharged from the Air Force by reason of physical disability with entitlement to disability severance pay. Def.'s

---

Cir. 2000) (noting that decisions of the circuit courts of appeals "are not binding on the Court of Federal Claims").

   [18] Decisions of the Court of Claims are binding authority on the Court of Federal Claims. See Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1353 (Fed. Cir. 2006) ("There can be no question that the Court of Federal Claims is required to follow the precedent of the Supreme Court, our court, and our predecessor court, the Court of Claims."); Int'l Bus. Machs. Corp. v. United States, 37 Fed. Cl. 599, 603 (1997) ("In this jurisdiction decisions of the Federal Circuit and the Court of Claims have binding precedential authority. When the Federal Circuit decides that a decision of the Court of Claims no longer merits precedential authority, it overrules the decision, after providing sufficient explanation, in an en banc decision[.]").

Mot. App. 1-2; Def.'s Reply App. 3, 8.  Plaintiff's argument is directly contrary to binding decisional law of this circuit and cannot be sustained.  Plaintiff filed his complaint in this court on June 16, 2009, more than six years after both dates on which he was either removed from active duty or was discharged from the Air Force.  Because plaintiff filed his wrongful discharge claim after the expiration of the applicable statute of limitations, such a claim is untimely.

### B.  The Statute of Limitations Bars Plaintiff's Claim for Disability Retirement Pay

To the extent that plaintiff asserts a claim for disability retirement pay pursuant to 10 U.S.C. § 1201, such a claim is also foreclosed by 28 U.S.C. § 2501.  "Unlike claims based on wrongful discharge, a claim for disability retirement pay generally does not accrue until an appropriate military board denies the claim in a final decision, or refuses to hear the claim."  Sabree, 2009 WL 4729666, at *7.  Congress, the Court of Claims explained, "entrusted the military boards with the task of determining whether a serviceman should be retired for disability and therefore that no cause of action arises (and the statute of limitations does not run) until a proper board has acted or declined to act."  Friedman, 310 F.2d at 389.  Furthermore, the Court of Claims recognized that

> jurisdiction is conferred by Congress, not on this court, but on retiring boards and the Secretaries of the three armed services, to decide an officer's right to retirement for physical disability, and his consequent right to retired pay; . . . it follows therefrom that we cannot acquire jurisdiction of such a claim until after the board and the Secretary have acted, or failed or refused to act, and not then unless the board and the Secretary acted arbitrarily or capriciously or contrary to law[.]

Furlong v. United States, 152 F. Supp. 238, 240 (Ct. Cl. 1957).  "The decision by the first statutorily authorized board that hears or refuses to hear the claim invokes the statute of limitations."  Chambers, 417 F.3d at 1224 (citations omitted); accord Real v. United States, 906 F.2d 1557, 1560 (Fed. Cir. 1990); see also Friedman, 310 F.2d at 396 ("[W]here the Correction Board is not a reviewing tribunal but is the first board to consider or determine finally the claimant's eligibility for disability retirement, the single cause of action accrues upon the Correction Board's final decision."); Furlong, 152 F. Supp. at 240 ("[S]ince our jurisdiction could not be invoked until after the retiring board and the Secretary had acted, the statute of limitations on a suit in this court did not begin to run until they had acted[.]").  Thus, the Court of Federal Claims "has no jurisdiction over disability retirement claims until a military board evaluates a service member's entitlement to such retirement in the first instance."  Chambers, 417 F.3d at 1225.

In Friedman, the Court of Claims explained that the "Retiring Board is the proper board, but where the claimant has not had or sought a Retiring Board, his claim does not accrue until final action by the Correction Board (which in that instance stands in the place of the Retiring Board as the proper tribunal to determine eligibility for disability retirement)."  310 F.2d at 396.

Today, the Retiring Board is referred to as a PEB.  <u>Chambers</u>, 417 F.3d at 1225 n.2.  "[I]f at the time of discharge, the service member requested review by an appropriate board and the request was denied, or if the board heard the service member's claim and denied it, then the limitations period begins to run upon discharge."  <u>Id.</u> at 1225 (citing <u>Real</u>, 906 F.2d at 1560).  Plaintiff alleges that both an Informal and Formal PEB were convened to evaluate him.  <u>See</u> Compl. ¶¶ 13 (asserting than an Informal PEB assigned plaintiff disability ratings on August 25, 2000), 14 (asserting that an Informal PEB modified its disability rating on April 8, 2002), 15-16 (asserting that a Formal PEB, on June 22, 2002, concurred with determinations made by the Informal PEB and recommended that plaintiff be discharged).  Accordingly, the statute of limitations began running on plaintiff's claim for military disability compensation when the PEB acted upon his claim, <u>viz.</u>, on June 22, 2002.[19]  <u>See Real</u>, 906 F.2d at 1560 ("The decision by the first statutorily authorized board which hears or refuses to hear the claim is the triggering event.").  Any claim plaintiff may have had for judicial review was time-barred in 2008.

To the extent that plaintiff asserts that the statute of limitations was tolled based upon his subsequent petitions to the AFBCMR, such a contention is not supported by binding precedent in this circuit.  In <u>Real</u>, the Federal Circuit explained that any "subsequent petition to the corrections board does not toll the running of the limitations period; nor does a new claim accrue upon denial of a petition by the corrections board."  906 F.2d at 1560 (citation omitted); <u>see also</u> <u>Friedman</u>, 310 F.2d at 390 ("There is no tolling by further consideration after final board action. . . .  [W]here a proper board has acted finally the running of the statute is not tolled by later consideration by other boards or agencies.  In particular, where full action by a Retiring Board has been had (or refused), later review by the Disability Review Board or the Correction Board does not toll the statute."[20]).  Plaintiff's request for review to the AFBCRM in 2003 and his subsequent request in 2008, therefore, neither tolled the running of the statute of limitations nor created new claims.

### C.  Plaintiff Has Neither Alleged nor Demonstrated That He Suffers From a Legal Disability That Entitles Him to Toll the Statute of Limitations

Equitable tolling "preserves a plaintiff's claims when strict application of the statute of limitations would be inequitable."  <u>United States v. Patterson</u>, 211 F.3d 927, 930 (5th Cir. 2000).  Although the Supreme Court has indicated that equitable tolling is unavailable in the Court of Federal Claims under the Tucker Act because 28 U.S.C. § 2501 sets forth a "more absolute[]

---

[19]  Alternatively, the latest possible date on which plaintiff's disability pay claim accrued was August 25, 2002, the date on which he was discharged.  <u>See</u> <u>Chambers</u>, 417 F.3d at 1225.

[20]  In <u>Friedman</u>, the Court of Claims noted one possible exception; however, it determined that this unique case "contains no now-relevant discussion of limitations" and had "no explanation . . . as to the basis for the silent holding that the entire claim was not time-barred." 310 F.2d at 390.  As such, the Court of Claims deemed that case an anomaly, concluding that it was neither "'hard' [n]or full precedent."  <u>Id.</u>

kind of limitations period," John R. Sand & Gravel Co., 552 U.S. at 136, paragraph three of section 2501 permits tolling under limited circumstances: "A petition on the claim of a person under legal disability or beyond the seas at the time the claim accrues may be filed within three years after the disability ceases." 28 U.S.C. § 2501.

Plaintiff, for the first time in his opposition brief, contends that the court should toll the six-year limitation period under the aforementioned provision of section 2501 because he was suffering from a mental impairment: "Plaintiff could not have knowingly and voluntarily accepted the [AF]BCMR, PEB . . . determinations because he was suffering from a mental impairment at the time." Pl.'s Opp'n 3; see also id. at 3-4 ("Plaintiff was suffering from a mental illness at the time of his MEB and PEB processing, as well as during his Discharge and attempts for a record's correction."). Plaintiff maintains that, due to his mental illness, he "could not have fully appreciated the situation" when he received the MEB's decision and when he signed the PEB proceeding form. Id. at 4. Plaintiff also asserts that "[h]e could not have truly comprehended what had happened in the prior proceedings" and that he could not have understood what was necessary for him to "continue his case." Id. at 5. Therefore, according to plaintiff, "[a] person suffering from a mental impairment will not have waived judicial review if he can show he was 'incapable of exercising free will or understanding his actions at time.'" Id. at 3 (quoting Gallucci v. United States, 41 Fed. Cl. 631, 643 (1998)[21]). As previously explained, plaintiff never asserted these allegations in his complaint and presents these arguments for the first time in response to the government's motion. Furthermore, the court notes that plaintiff provides only the assertions of his counsel, rather than any documentary evidence, in support of this position. Although plaintiff's failure to allege this condition in the complaint, standing alone, warrants dismissal of plaintiff's claim, see, e.g., Peck v. W. Aurora Sch. Dist. 129, No. 06-C-1153, 2006 WL 2579678, at *5 (N.D. Ill. Aug. 30, 2006) (dismissing a 42 U.S.C. § 1983 claim because plaintiffs, while arguing in their response brief that their injury was caused by an official with final policy-making authority, failed to assert such an allegation in their complaint), the court nevertheless addresses plaintiff's position.

Plaintiff's arguments raise the question of whether he could allege, and ultimately prove, that he was under a continuous legal disability within the meaning of 28 U.S.C. § 2501. The

---

[21]  Plaintiff's reliance upon Gallucci, as well as Poole v. United States, 64 Fed. Cl. 776, 781 (2005), for the proposition that a mental condition can overcome the presumption of voluntariness, see Pl.'s Opp'n 3, is misplaced. In neither case did the Court of Federal Claims address the applicable statute of limitations. In Gallucci, the service member alleged that his resignation from the United States Marine Corps was involuntary, a position that the court ultimately rejected. 41 Fed. Cl. at 643. In this case, plaintiff has not alleged that his separation from the Air Force was involuntary. In Poole, the court addressed whether the service member waived objections to his disability rating when he concurred in the PEB's recommendation. See 64 Fed. Cl. at 780-82. In this case, plaintiff did challenge the recommendations of the Formal PEB. See, e.g., Def.'s Reply App. 1 (containing plaintiff's July 3, 2002 letter to the AFPB in which plaintiff asserts that he "totally disagree[s] with the findings of the Formal PEB").

word "disability" "is . . . a term of many meanings," Capoeman v. United States, 440 F.2d 1002, 1004 (Ct. Cl. 1971), but it "does not include all types of mental illnesses," Bond v. United States, 43 Fed. Cl. 346, 349 (1999) (citing Bennett v. United States, 36 Fed. Cl. 111, 113 (1996)). The "'legal disability'" provision of section 2501 was designed "to provide relief from some personal handicap or impediment affecting the individual litigant and preventing him from bringing a timely suit." Goewey v. United States, 612 F.2d 539, 544 (Ct. Cl. 1979). In order to rise to the level of a legal disability under section 2501, a claimant's mental illness "must be acute and extreme–it must render the plaintiff 'incapable of caring for his property, of transacting business, of understanding the nature and effect of his acts, and of comprehending his legal rights and liabilities.'" Ware v. United States, 57 Fed. Cl. 782, 788 (2003) (quoting Goewey, 612 F.2d at 544); see also Barrett v. Principi, 363 F.3d 1316, 1321 (Fed. Cir. 2004) (determining that, in order to obtain the benefit of equitable tolling, a veteran "must show that the failure to file was the direct result of a mental illness that rendered him incapable of 'rational thought or deliberate decision making' or 'incapable of handling [his] own affairs or unable to function [in] society'" (alterations in original) (citations omitted)); Bond, 43 Fed. Cl. at 349 ("To toll the statute of limitations a legal disability must impair the claimant's access to the court."). Thus, a claimant's "ignorance of his right to bring suit in accordance with a cause of action is not a legal disability that tolls the statute of limitations." Bond, 43 Fed. Cl. at 349 (citing Coon v. United States, 30 Fed. Cl. 531, 539 (1994)).

A claimant "must show that his disability existed at the time when the claim accrued rather than arising some time thereafter and that he suffered from the disability continually during the period in which the statute is to be tolled." Ware, 57 Fed. Cl. at 788; accord Waldorf v. United States, 8 Cl. Ct. 321, 324 (1985). "The statute of limitations recommences, however, if 'subsequent to the onset of a disability, the plaintiff experiences a lucid or non-disabling period.'" Bond, 43 Fed. Cl. at 349 (quoting Coon, 30 Fed. Cl. at 539). If, after the claimant regains legal capacity, he relapses again into a legal disability, the statute of limitations continues to run. Id. (citing Coon, 30 Fed. Cl. at 539).

Furthermore, a claimant has a "high hurdle to toll the statute of limitations on the basis of a legal disability." Ware, 57 Fed. Cl. at 788. The law presumes sanity and competency, and plaintiff bears the burden of demonstrating mental incapacity that rises to the level of a legal disability in order to fall within the tolling provision of section 2501. Goewey, 612 F.2d at 544. "When a question of jurisdictional fact such as legal disability exists, the court is not restricted to the face of the pleadings, and may review extrinsic evidence such as affidavits." Bond, 43 Fed. Cl. at 349 (citing Land v. Dollar, 330 U.S. 731, 735 n.4 (1947)).

Here, plaintiff has presented no evidence, other than the unsupported legal contentions of counsel, in an effort to meet his high burden of establishing that he suffered from a legal disability. "A medical diagnosis alone or vague assertions of mental problems will not suffice." Barrett, 363 F.3d at 1321. Indeed, the materials before the court indicate that plaintiff was under no legal disability in 2002 or any time thereafter and instead demonstrate that plaintiff was wholly capable of rational thought and deliberate decision making such that he could handle his

16

own affairs.  See id.  For example, in July 2002, plaintiff submitted a rebuttal letter challenging the findings of the Formal PEB, see Def.'s Reply App. 1, thus indicating that plaintiff both fully understood the ramifications of the Formal PEB's determinations and disagreed with them, see Ware, 57 Fed. Cl. at 788.  Shortly thereafter, in January 2003, plaintiff filed an Application for Correction of Military Record with the AFBCMR, see Def.'s Reply App. 3-4, wherein he asserted that he was a "victim of injustice concerning my military record" and that the Formal PEB "misinterpreted" medical evidence.  Id. at 4.  Plaintiff also indicated that the "date of discovery" of any alleged error or injustice was June 2002.  Id. at 3.  Plaintiff's actions in 2002 and 2003 to contest the Formal PEB's determinations reflect his ability to understand the nature and effect of his actions at or near the time his claim accrued, and his conduct indicates that he both comprehended and was exercising his legal rights.  See Ware, 57 Fed. Cl. at 788.

Additional evidence in the record militates against a finding that plaintiff suffered from a legal disability.  In March 2004, plaintiff responded to the AFBCMR's denial of his application by again maintaining that "there is an injustice being made in my case."  Def.'s Reply App. 9.  Plaintiff proffered additional documentation and requested that the AFBCMR "reconsider the whole matter and restore my retired status . . . ."  Id.  In its September 15, 2006 rating decision, the VA determined that plaintiff "had no evidence of delusions or hallucinations.  [Plaintiff's] judgment is not impaired . . . ."  Pl.'s Ex. 2.  It further determined that its evaluation of fifty percent disability for sleep apnea, status post UPPP, was appropriate because

> [a] higher evaluation of 70 percent is not warranted unless there are deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals . . . ; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriate and effectively . . . .

Id. at 3.  Indeed, the VA's rating decision refutes plaintiff's claim that his condition rose to the level of a legal disability.  See id.  In 2008, plaintiff again filed an "Application for Correction of Military Record," see Def.'s Reply App. 8, indicating that the "date of discovery" for the alleged error or injustice was August 25, 2002, id., requesting that the AFBCMR "take into serious reconsideration" various medical evidence, including the documentation of medical specialists, plaintiff's medical profile and medication list, and other records, id. at 10, and directing the AFBCMR to the appropriate VA regional office where his medical records were maintained, id. at 9.  Also in 2008, plaintiff sought relief from his elected representative, requesting that Congressman Green (1) assist him with regard to six specific inquiries, including why the AFBCMR allegedly discounted or ignored the evaluations of several physicians and other medical evidence, id. at 6-7, and (2) serve as "an active participant in recommending that the AFBCMR approves [his] 100% [disability on the] PDRL with all associated benefits of a disabled military retiree," id. at 7.

Plaintiff's counsel's assertion that his client "could not have truly comprehended what had happened in the prior proceedings," Pl.'s Opp'n 5, is contradicted by plaintiff's own conduct.

None of this evidence suggests that plaintiff suffered from a legal disability such that he was incapable of understanding the nature and effect of his actions or that he was incapable of comprehending his legal rights.  See Ware, 57 Fed. Cl. at 788.  In fact, this evidence demonstrates that plaintiff was fully capable of rational thought, deliberate decision making, and handling his own affairs.  See Barrett, 363 F.3d at 1321.  Moreover, this evidence does not suggest that plaintiff's access to the court was impaired by any legal disability, see Bond, 43 Fed. Cl. at 349, particularly since plaintiff exercised his legal right to seek relief from the AFBCMR on multiple occasions, one of which occurred at or near the time his claim accrued, and composed correspondence to the AFBCMR and to his elected representative setting forth reasons–together with supporting documentation–as to why he believed he was entitled to relief.  Plaintiff's efforts to assert his legal rights and obtain relief render as unsustainable and unsupportable his naked claim that he "could not have truly comprehended what had happened in the prior proceedings," Pl.'s Opp'n 5, and plaintiff has failed to allege that he was ignorant of facts that were either concealed by the Air Force or were unknowable to him, see Goewey, 612 F.2d at 544 (recognizing that the statute may be tolled where a claimant's ignorance of facts stemmed from their "inherent unknowability" or intentional concealment by the government).  But see Pl.'s Opp'n 5 (claiming that plaintiff never received proper notice for his appeals).  In fact, plaintiff continued to furnish materials to the AFBCMR that he believed supported his claims for relief.  That plaintiff may not have been aware of his right to seek relief in the Court of Federal Claims does not constitute a legal disability.  See Bond, 43 Fed. Cl. at 349.

In short, plaintiff has failed to allege and has not presented any evidence that he suffered from a legal disability at any time prior to filing his complaint.  As a result, plaintiff has not demonstrated that the tolling provision of section 2501 has any application in this case.  The court, therefore, lacks jurisdiction over the complaint because it was filed beyond the applicable limitations period.

### D.  The Tolling Provision of the SCRA Does Not Apply to Plaintiff

The SCRA "protects members of the military from expiring statutes of limitation while on active duty."  Ackerman v. United States, No. 07-787C, 2009 WL 586121, at *2 (Fed. Cl. Feb. 27, 2009); see also Diamond v. United States, 344 F.2d 703, 706 (Ct. Cl. 1965) (explaining that the "express purpose of the Civil Relief Act is, by means of the temporary suspension of certain legal proceedings which might prejudice the rights of persons in military service, 'to enable such persons to devote their entire energy to the defense needs of the Nation'" (quoting 50 U.S.C. app. § 510 (1958)).[22]  The tolling provision of the SCRA, 50 U.S.C. app. § 526(a),

--------------------------------------------------------

[22]  The SCRA "has existed in various forms and under different names since 1918, but has always included a provision requiring the tolling of statutes of limitations for service members during their periods of military service."  Lowe v. United States, 79 Fed. Cl. 218, 224 (2007).  In 2003, Congress amended the SCRA, moving the tolling provision from the 1940 act to section 526.  See Pub. L. 108-189, § 1, 117 Stat. 2844 (2003); Act of Oct. 17, 1940, ch. 888, § 205, 54 Stat. 1181.

provides:

> The period of a servicemember's military service may not be included in
> computing any period limited by law, regulation, or order for the bringing of any
> action or proceeding in a court, or in any board, bureau, commission, department,
> or other agency of a State (or political subdivision of a State) or the United States
> by or against the servicemember or the servicemember's heirs, executors,
> administrators, or assigns.

The "express terms of the [SCRA] make certain that the tolling of the statute of limitations is
unconditional." Bickford v. United States, 656 F.2d 636, 639 (Ct. Cl. 1981).  Therefore, "the
only real issue in triggering the Act's tolling provision is exactly what constitutes 'military
service.'" Lowe, 79 Fed. Cl. at 224 (quoting Bickford, 656 F.2d at 639).

The term "military service" is defined in the SCRA as "active duty, as defined in section
101(d)(1) of title 10, United States Code,"[23] 50 U.S.C. app. § 511(2)(A)(i), and "any period in
which a servicemember is absent from duty on account of sickness, wounds, leave, or other
lawful cause," id. § 511(2)(C).  Once a service member is released from active duty, the tolling
provision of the SCRA ceases to operate and the six-year statute of limitations begins to run.
Lowe, 79 Fed. Cl. at 225 (citing Diamond, 344 F.2d at 706).

Plaintiff was "relieved of active duty" effective November 13, 2000.  Def.'s
Supplemental App. 2.  Plaintiff's DD Form 214 indicates that his date of separation was
November 13, 2000.[24]  Id. at 1.  Plaintiff himself alleges that he was honorably discharged from
the Air Force on November 13, 2000.  Compl. ¶¶ 5, 8.  In Diamond, the Court of Claims
determined that the service member's release from active duty, which occurred on June 14, 1949,
"terminated his 'period of military service'" and that the tolling provision of the SCRA did not
apply to the service member's claims after June 14, 1949.  344 F.2d at 706.  Under the binding
authority of Diamond, because plaintiff's military service terminated on November 13, 2000, the
date upon which he was released from active service, the tolling provision of the SCRA no

---

[23]  "Active duty" is defined as follows:

> [F]ull-time duty in the active military service of the United States.  Such term
> includes full-time training duty, annual training duty, and attendance, while in the
> active military service, at a school designated as a service school by law or by the
> Secretary of the military department concerned.  Such term does not include full-
> time National Guard duty.

10 U.S.C. § 101(d)(1).

[24]  DD Form 214 "is authoritative in determining when the tolling provision of [the]
SCRA ended." Lowe, 79 Fed. Cl. at 225.

longer applied to plaintiff after November 13, 2000.  As such, plaintiff's claim, which was filed more than six years after November 13, 2000, is time-barred by 28 U.S.C. § 2501.

Plaintiff, however, asserts that a service member who has been placed on the TDRL has, in essence, remained in active service.  This argument wholly ignores the documentary evidence presented in this case.  Nevertheless, the court addresses plaintiff's position, which is summarized by the following policy argument:

> It would be insulting to the wounded soldier to say he was not "active" while on [TDRL].  Admittedly, a soldier on TDRL is not performing the "normal" duties of a military member: running through obstacles, training on military equipment, or even fighting the wars in the Middle East.  But, he is performing a very important mission: Healing from the medical conditions resulting from the aforementioned activities.

Pl.'s Errata Supplemental Br. 3; see also Pl.'s Reply Def.'s Supplemental Br. 1 ("[T]he soldier during TDRL is devoting his energy in recovering from the injuries sustained in the course of defending our nation.  Whether in a hospital, in a clinic, or at home, the soldier's mission is recovery to ideally good health or maximum medical improvement.").  Plaintiff further asserts that "[i]t would be unconscionable to deny any soldier injured in the course of protecting his country the protections of [the] SCRA."  Pl.'s Reply Def.'s Supplemental Br. 1-2.

Plaintiff's impassioned arguments do not find support in either statutory or decisional law.  With regard to the former, Congress has indicated that any service member whose name appears on the TDRL is considered "temporarily retired," though the service member must submit to a physical examination at least once every eighteen months while on the TDRL.  10 U.S.C. § 1210(a).  While on the TDRL, a service member is entitled to "retired pay computed under section 1401 of this title."  Id. § 1202 (emphasis added).  Disability retired pay terminates "on the date when he is appointed, reappointed, enlisted, or rerenlisted . . . ."  Id. § 1211(d)(3).  Indeed, as reflected in its title, section 1211 addresses the "return to active duty" by service members on the TDRL, id. § 1211 (emphasis added), and indicates that Congress did not deem a service member on active duty while the service member was on the TDRL:

> (a) With his consent, any member of the . . . Air Force whose name is on the temporary disability retired list, and who is found to be physically fit to perform the duties of his office, grade, or rank under section 1210(f) of this title, shall–
>
> > (1) if a commissioned officer of a regular component, be recalled to active duty and, as soon as practicable, may be reappointed by the President, by and with the advice and consent of the Senate, to the active-duty list in the regular grade held by him when his name was placed on the temporary disability retired list, or in the next higher regular grade;

(2) if a warrant officer or a regular component, <u>be recalled to active duty</u> and, as soon as practicable, be reappointed by the Secretary concerned in the regular grade held by him when his name was placed on the temporary disability retired list, or in the next higher regular warrant grade;

(3) if an enlisted member of a regular component, <u>be reenlisted</u> in the regular grade held by him when his name was placed on the temporary disability retired list or in the next higher regular enlisted grade[.]

<u>Id.</u> § 1211(a)(1)-(3) (emphasis added).  As an enlistee who attained the grade of staff sergeant, plaintiff is subject to section 1211(a)(3).  Furthermore, section 1211(a) makes clear that a service member whose condition improves is not compelled to return to active duty.  Rather, the service member must consent to a change of status.  <u>See id.</u> § 1211(a) (containing the conditional language "[w]ith his consent"); <u>see also</u> Def.'s Supplemental Br. 5 (explaining that the consent requirement "confirms Congress's understanding that servicemembers on the TDRL are not engaged in active military service[] because servicemembers engaged in active military service cannot choose whether to perform their military duties").  If the service member does not consent, then the service member's "status on the temporary disability retired list and his disability retired pay shall be terminated as soon as practicable and the member shall be discharged."  10 U.S.C. § 1211(c).

Congress has indicated that service members who are on the TDRL are not engaged in active military service.  Plaintiff's arguments to the contrary ignore the statutory language and framework discussed above.  Although placement on the "TDRL is not the signal of the end of one's military career," Pl.'s Errata Supplemental Br. 3, plaintiff has not cited any provision that supports his contention that he was engaged in active service while on the TDRL.

With regard to decisional law, the Federal Circuit has unequivocally determined that "the status of a member on the TDRL is akin to inactive duty or retirement, as opposed to 'active service.'" <u>Dambrava v. Office of Pers. Mgmt.</u>, 466 F.3d 1061, 1063 (Fed. Cir. 2006); <u>see also id.</u> at 1064 ("TDRL is not active service."); <u>Craft v. United States</u>, 544 F.2d 468, 476 (Ct. Cl. 1976) ("When on the temporary retired disability list, a serviceman is actually separated from the military.  During this limbo status, the soldier receives disability pay.").  The <u>Dambrava</u> court also noted that the United States Court of Appeals for the Armed Services, along with several other regional circuit courts of appeals, has characterized time spent on the TDRL as not constituting active duty.  466 F.3d at 1064 (discussing <u>United States v. Stevenson</u>, 53 M.J. 257, 258-59 (C.A.A.F. 2000), wherein the appellate court noted that a service member who becomes disabled while on active duty may receive permanent or temporary disability retirement and that a service member on the TDRL, who, once again, becomes physically fit to perform his or her duties, "may be returned to active duty with his or her consent, retired if otherwise eligible for retirement, discharged, or transferred to the inactive reserves").  Plaintiff does not address this

precedent.

Instead, plaintiff cites two nonbinding decisions in support of his position, Cruz v. General Motors Corp., 308 F. Supp. 1052 (S.D.N.Y. 1970), and Mason v. Texaco Inc., 862 F.2d 242 (10th Cir. 1988). The Cruz court recognized that the TDRL "is an interim status for a serviceman eligible for permanent retirement whose disability has not yet sufficiently stabilized to permit an accurate final determination." 308 F. Supp. at 1055-56. While on the TDRL, the Cruz court explained that the service member "has not been discharged from service, but his status is subject to final disposition" by the military. Id. at 1056. The Cruz court determined that the plaintiff, while on the TDRL, was "lawfully 'absent from duty' on account of his injuries, awaiting a final evaluation of those injuries, which would be determinative of whether he was to be returned to duty or permanently retired." Id. Ultimately, the plaintiff in Cruz was permanently retired for physical disability on April 1, 1965, and "[n]ot until that date did the tolling provision cease operating in his favor–that was the date of his discharge from active service." Id. Holding that the limitations period was tolled by the SCRA until April 1, 1965, the date on which the plaintiff was placed on the retirement list for permanent disability, the Cruz court determined that plaintiff's complaint was timely because the action was brought before the running of the applicable two-year statute of limitations. Id. at 1057.

Plaintiff's reliance upon Cruz does not support his claim that the tolling provision of the SCRA applies in this case. The Cruz court unequivocally determined that courts must look to the date on which the service member was placed on the retirement list for permanent disability in order to determine the date on which any possible tolling of the statute of limitations under the SCRA ended. The latest possible date on which that event occurred in this case was August 25, 2002, the date on which plaintiff was removed from the TDRL and was discharged from the Air Force by reason of physical disability with entitlement to disability severance pay. See Def.'s Mot. App. 1-2; accord Def.'s Reply App. 3, 8. Plaintiff did not file his complaint in the Court of Federal Claims within six years of that date, and nothing in Cruz suggests that the limitations period set forth in 28 U.S.C. § 2501 could be tolled after August 25, 2002.

In Mason, the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") held that the tolling provision of the SCRA applied to a United States Coast Guard service member while he was on the TDRL. The service member, who was diagnosed as having acute myelocytic leukemia, was placed on the TDRL on March 15, 1978. 862 F.2d at 245. He was permanently retired on November 5, 1979, and died shortly thereafter. Id. The Tenth Circuit, citing Cruz, held that placement on the TDRL "constitutes 'absen[ce] from duty on account of sickness'" such that the applicable Kansas two-year statute of limitations was tolled from March 15, 1978, until November 5, 1979. Id. Notably, the federal government was not a party in Mason, and the court relied upon the SCRA provision that construed military service as "any period during which a servicemember is absent from duty on account of sickness, wounds, leave, or other lawful cause." Id. (quoting 50 U.S.C. app. § 511(1) (1982)). The court is not bound by Mason, which does not elaborate upon the circumstances of the service member's separation, and it declines to make a determination that a sickness, as noted in 50 U.S.C. app. § 511(2)(C), rises to

the level of a disability.  Furthermore, plaintiff's justification for his reliance upon <u>Mason</u>–that "[t]he opinion in <u>Mason</u> was for the plaintiff," Pl.'s Errata Supplemental Br. 2–is incorrect.[25]

The court is bound by the precedential decisions of the Court of Claims and the Federal Circuit that have concluded that TDRL status is not equivalent to active service.  Therefore, plaintiff, who was released from active service on November 13, 2000, and discharged from the Air Force on August 25, 2002, cannot invoke the tolling provision of the SCRA.  The latest possible date upon which plaintiff's claims could have accrued was August 25, 2002, and plaintiff did not file his complaint in the Court of Federal Claims until June 16, 2009, nearly seven years later.

## V.  CONCLUSION

Plaintiff's claims challenging his discharge from the Air Force and seeking disability retirement pay accrued in 2002.  The complaint, which plaintiff filed in the Court of Federal Claims on June 16, 2009, is time-barred.  For the reasons discussed above, plaintiff has failed to demonstrate that he suffered from a legal disability that justifies tolling of the applicable statute of limitations and has failed to demonstrate that the tolling provision of the SCRA applies in this case.  Accordingly, the government's motion is **GRANTED**, and plaintiff's request for remand to the AFBCMR is **DENIED**.  Plaintiff's complaint is **DISMISSED** for lack of jurisdiction, and the clerk is directed to enter judgment accordingly.  No costs.

As stated in note 1, <u>supra</u>, the court has filed this opinion under seal due to its detailed description of plaintiff's medical history.  If either party believes that this opinion contains

---

[25]  Texaco, Inc. ("Texaco"), the defendant in <u>Mason</u>, was found liable for plaintiff's wrongful death and appealed a jury verdict entered against it for $3.15 million.  862 F.2d at 244.  Although the Tenth Circuit rejected Texaco's arguments that the district court erred by determining that (1) the plaintiff's claims were not time-barred by the Kansas statute of limitations, and (2) the SCRA applied to a "career military employee without any showing of disability to bring legal suit," <u>id.</u>, it ultimately reversed the judgment against Texaco on other grounds–namely improper jury instructions–and remanded the case for a new trial, <u>id.</u> at 250.  Such a disposition can hardly be characterized as a decision in favor of the service member's widow and administratrix of his estate.

Ultimately, a second trial concluded with a jury award to the service member's widow and administratrix of his estate in the amount of $9.025 million in actual damages and $25 million in punitive damages.  <u>See</u> <u>Mason v. Texaco, Inc.</u>, 741 F. Supp. 1472 (D. Kan. 1990).  The district court denied Texaco's motion for judgment notwithstanding the verdict, <u>id.</u> at 1519, and Texaco appealed to the Tenth Circuit.  Although the Tenth Circuit affirmed the jury verdict, it remanded with directions that the district court enter a remittitur order reducing the $25 million punitive damages award to $12.5 million.  <u>Mason v. Texaco, Inc.</u>, 948 F.2d 1546, 1548, 1561 (10th Cir. 1991).

protected material that should be redacted prior to the opinion being made available to the public, then that party shall file, **by no later than Friday, March 19, 2010**, a motion requesting redaction that specifically describes the material proposed for redaction and the reason for the redaction request.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge